# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TRANSDEV ON DEMAND, INC., | ) |
| | ) |
| *Plaintiff/Counterclaim-Defendant,* | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 2019-0912-SG |
| | ) |
| BLACKSTREET INVESTMENT | ) |
| HOLDINGS, LLC, | ) |
| | ) |
| *Defendant/Counterclaim-Plaintiff.* | ) |

## MEMORANDUM OPINION

Date Submitted: August 7, 2020
Date Decided: November 30, 2020

John L. Reed, Peter H. Kyle, and Kelly L. Freund, of DLA PIPER LLP (US), Wilmington, Delaware; OF COUNSEL: Laura Sixkiller and Kyle T. Orne, of DLA PIPER LLP (US), Phoenix, Arizona, *Attorneys for Plaintiff/Counterclaim-Defendant*.

Thomas E. Hanson, Jr. and William J. Burton, of BARNES & THORNBURG LLP, Wilmington, Delaware, *Attorneys for Defendant/Counterclaim-Plaintiff*.

GLASSCOCK, Vice Chancellor

The seller of a company promised to provide financial information in a certain form, prior to closing. According to the buyer, it failed. This Memorandum Opinion largely concerns itself with the seller's argument that the buyer, allegedly contractually prevented from seeking contract damages for breach, has attempted to bootstrap the contractual claim into a claim for fraud.

"Bootstrap" is, to me, an interesting metaphor. The actual bootstrap, of course, is a leather loop at the back of a high boot that allows a wearer to bring his strength to bear in pulling the boot over his heel. A third party, assuming sufficient strength of arm and loop, could lift a wearer by these bootstraps; lacking a fulcrum, however, a wearer never can. This observable fact has led to the phrase "he lifted himself by his own bootstraps," meaning that one has, admirably, by great effort overcome seemingly impossible obstacles without assistance. The impossibility of lifting oneself thus has also given rise to a metaphorical verb in legalese, "to bootstrap," meaning to make an unsupported attempt to create from one thing or proposition an unlikely or impermissible other.[1] Here, the seller's allegation is that the buyer has attempted to create, from the breach of a promise to act, a tort, common-law fraud, on the theory that the seller never intended to perform. If true, this is an impermissible bootstrap.

---

[1] Leading to the noun form for an instance of such an action, a "bootstrap." The term may also refer to an individual creating the conditions by which she extends her own power or ability to act. *See* Stuart M. Benjamin, *Bootstrapping*, 75 Law and Contemp. Probs., no. 3, 2012, at 115.

The unusual contract at issue involves a sale by the Plaintiff and Counterclaim-Defendant, Transdev on Demand, Inc. ("Transdev"), of its wholly-owned subsidiary, SuperShuttle International, Inc. ("SuperShuttle"), to Defendant and Counterclaim-Plaintiff, Blackstreet Investment Holdings, LLC ("Blackstreet"). The term "sale" is accurate but misleading; SuperShuttle had, apparently, negative value, the sales price totaled $1.00, and Transdev agreed to retain certain liabilities and to fund working capital, initially by providing roughly $18 million to SuperShuttle for that purpose (the "Initial Funding Amount"), with the amount to be "trued up" post-closing. The contract required Transdev to provide financial information pre-closing, and then to make an "Estimated Closing Working Capital Statement," to which Blackstreet could object. It is the truing-up process that is the issue here; the parties dispute the amount due SuperShuttle from Transdev as working capital, and whether the contract controlling the sale requires that amount to be determined by an accountant or the Court.

Transdev, the natural party defendant, brought this action for declaratory judgment. It seeks a declaration that Blackstreet failed to make a timely objection to the Estimated Closing Working Capital Statement, and thus has waived its contractual right to object. It also seeks a declaration that, in any event, Blackstreet's contractual rights have terminated and that this Court must resolve any remaining legal issues regarding working capital. Blackstreet counterclaimed 1) seeking

2

specific performance of a contractual provision requiring the parties to submit the dispute to an independent accountant; 2) seeking a declaration that Transdev breached the contract in computing working capital; and 3) claiming that Transdev fraudulently induced Blackstreet to purchase SuperShuttle via inaccuracies in its contractually-required financial disclosures.

Before me is the Plaintiff's Motion to Dismiss the counterclaims. For the reasons that follow, that Motion is granted in part and denied in part.

## I. BACKGROUND[2]

*A. The Parties*

Blackstreet, the Defendant and Counterclaim-Plaintiff, is a Delaware limited liability company with its principal place of business in Maryland.[3] Blackstreet is a holding company created to purchase the stock of SuperShuttle.[4]

Transdev, the Plaintiff and Counterclaim-Defendant, is a Delaware corporation with its principal place of business in Illinois.[5]

---

[2] The facts, except where otherwise noted, are drawn from the Defendant's First Amended Answer to Verified Complaint and Counterclaims, Dkt. No. 26 (the "Answer" and the "Amended Counterclaim" or "Am. Countercl."), and are presumed true for the purpose of evaluating the Plaintiff's Motion to Dismiss.

[3] Am. Countercl. ¶ 1.

[4] *Id.*

[5] *Id.* ¶ 2.

*B. Relevant Facts*

### 1. Blackstreet Agrees to Acquire SuperShuttle

Prior to its acquisition by Blackstreet, SuperShuttle was a wholly-owned subsidiary of Transdev providing shared-ride and private car transportation to and from various airports in the continental United States and Mexico.[6] However, due to a shifting transportation marketplace rife with new competition, SuperShuttle had suffered significant losses.[7] As a result of these losses, Transdev began to explore the possibility of selling SuperShuttle.[8]

After failing to close a sale with a different buyer, Transdev approached Blackstreet about potentially purchasing SuperShuttle.[9] SuperShuttle had lost $14.1 million in 2018, and by June 2019 its trailing twelve month losses were $13.1 million.[10] Accordingly, the parties entered into a stock purchase agreement (the "SPA") whereby Transdev would finance Blackstreet's purchase of SuperShuttle.[11]

### 2. Relevant Provisions of the Stock Purchase Agreement

Under the SPA, Transdev agreed to deposit an Initial Funding Amount of $17,953,375 into a SuperShuttle bank account at closing.[12] In exchange, Blackstreet

---

[6] *See id.* ¶¶ 2, 4.
[7] *Id.* ¶ 4.
[8] *Id.*
[9] *Id.* ¶ 5.
[10] *Id.* ¶ 7.
[11] *Id.* ¶ 6.
[12] *Id.* ¶¶ 8, 9.

agreed to purchase all of the issued and outstanding shares of SuperShuttle's common stock for $1.00 in total.[13] Certain "Excluded Assets" and "Excluded Liabilities" were to remain obligations of Transdev post-closing.[14] Transdev also agreed to provide certain unaudited financial statements of SuperShuttle that were "prepared in accordance with GAAP applied on a consistent basis throughout the period involved" and "fairly present[ed] in all material respects the financial condition of SuperShuttle as of the respective dates they were prepared and the results of the operations of SuperShuttle for the periods indicated."[15]

The Initial Funding Amount could be increased or decreased to ensure that SuperShuttle would have sufficient working capital to operate post-closing.[16] The parties agreed to a target amount for SuperShuttle's working capital of negative $5,575,000 (the "Target Working Capital").[17] Thus, if, at closing, SuperShuttle's working capital (the "Closing Working Capital") was less (or more) than the Target Working Capital, Transdev would deposit (or withdraw) the difference into the same account that held the Initial Funding Amount.[18] Section 2.06 of the SPA set forth the process for making these adjustments.[19]

---

[13] Am. Countercl. ¶ 9.
[14] *Id.* ¶ 9.
[15] *Id.* ¶ 10.
[16] *Id.* ¶¶ 13, 9.
[17] *Id.* ¶ 8.
[18] *Id.* ¶ 8.
[19] *Id.* ¶ 12.

Under Section 2.06(b), Transdev was required to provide, at least three business days before the closing date, a "good faith" statement of SuperShuttle's estimated Closing Working Capital, including certification by Transdev's President "that the Estimated Closing Working Capital was prepared in accordance with GAAP."[20] After receiving the Estimated Closing Working Capital Statement, Blackstreet had thirty days to review the statement and then provide any objections (the "Working Capital Review Period").[21] In the event of any objections, the parties were to negotiate in good faith to resolve them.[22] If, after thirty days of negotiations, any amounts remained in dispute, the parties agreed to submit the "Disputed Amounts" "to a mutually-agreed and nationally recognized firm of independent certified public accountants other than [Transdev]'s Accountants or [Blackstreet]'s Accountants" (the "Independent Accountant") for a binding determination of what, if any, adjustments should be made to the Initial Funding Amount.[23]

### 3. Blackstreet Objects to the Closing Working Capital Statement

At closing, Transdev provided Blackstreet with an Excel summary estimating that the Initial Funding Amount should be decreased by $7,000—the difference between Transdev's estimated Closing Working Capital and the Target Working

---

[20] *Id.* ¶ 14.
[21] *Id.* ¶ 15.
[22] *Id.* ¶ 16.
[23] *Id.* ¶ 17.

Capital of $5,575,000.[24] During the ensuing Working Capital Review Period, Blackstreet gained access to SuperShuttle's full books and records and historical financial information.[25] After examining SuperShuttle's books and records, Blackstreet came to the conclusion that Transdev's estimate had materially overstated SuperShuttle's current assets and had materially understated SuperShuttle's current liabilities.[26] As such, Blackstreet delivered Transdev its own calculation of SuperShuttle's estimated Closing Working Capital with supporting balance sheets comparing the parties' calculations.[27] Based on these calculations, Blackstreet asserts that the Initial Funding Amount actually needed to be increased by $7,485,177 to reach the amount required by the SPA.[28]

### 4. The Parties Fail to Resolve Objections

Over the next thirty days, the parties worked to resolve the discrepancies in their valuations, but were ultimately unsuccessful.[29] After Blackstreet demanded that the dispute be submitted to an Independent Accountant, Transdev initiated this action.[30]

---

[24] *Id.* ¶ 20.
[25] *Id.* ¶ 23.
[26] *Id.* ¶ 24.
[27] *Id.* ¶ 26.
[28] *Id.* ¶ 24.
[29] *Id.* ¶¶ 30–31.
[30] *Id.* ¶¶ 33, 36; *see also* Verified Compl. for Decl. J., Dkt. No. 1 [hereinafter the "Complaint" or "Compl."].

*C. Procedural History*

Transdev initiated this action on November 13, 2019, seeking declaratory relief.[31]  In its Complaint, Transdev asserts three counts for declaratory judgment against Blackstreet.[32]  First, Transdev seeks a declaration that the spreadsheet Blackstreet provided on October 9, 2019 (the "October 9 Spreadsheet") was not a Statement of Objections as defined in the SPA, and therefore, Blackstreet accepted Transdev's Estimated Closing Working Capital Statement.[33]  In the alternative, *i.e.*, if the Court determines that the October 9 Spreadsheet was a Statement of Objections, Transdev requests a declaration that those objections are invalid because they do not survive the Closing under Section 7.01 of the SPA.[34]  Lastly, Transdev seeks a declaration that an Independent Accountant may not determine legal issues and disputes or interpretations of the SPA and this Court is the exclusive forum for the parties to resolve their disputes relating to the Closing Working Capital.[35]

Blackstreet filed its first answer and counterclaim on December 12, 2019.[36] Transdev moved to dismiss Count II of that counterclaim, which sounded in breach

---

[31] *See generally* Compl.
[32] *See generally id.*
[33] *Id.* ¶ 70.
[34] *E.g., id.* ¶ 80.
[35] *Id.* ¶ 93.
[36] *See* Answer to Verified Compl. and Countercl., Dkt. No. 14.

8

of contract.[37]  Blackstreet responded by moving for judgment on the pleadings,[38] but subsequently filed its Amended Answer and Counterclaims,[39] which Transdev has also moved to dismiss.[40]  I heard oral argument on Transdev's Motion to Dismiss the Amended Counterclaims on August 7, 2020, and consider the matter submitted for decision as of that date.

## II. STANDARD OF REVIEW

The Defendants have moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6).[41]  The standard applicable to resolution of a motion to dismiss under Rule 12(b)(6) is well-established:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[42]

I need not, however, "accept conclusory allegations unsupported by specific facts, nor do we draw unreasonable inferences in the plaintiff's favor."[43]

---

[37] *See* Pl.-Countercl.-Def.'s Partial Mot. to Dismiss Def.-Countercl.-Pl.'s Countercls., Dkt. No. 17.
[38] *See* Mot. for J. on the Pleadings and-or Default J., Dkt. No. 18.
[39] *See generally* Answer and Am. Countercl., Dkt. No. 26.
[40] *See* Pl.-Countercl.-Def.'s Mot. to Dismiss Am. Countercls., Dkt. No. 30.
[41] Ct. Ch. R. 12(b)(6).
[42] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).
[43] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (internal quotation marks omitted).

Additionally, "the court may consider documents outside the pleadings when 'the document is integral to a plaintiff's claim and incorporated into the complaint.'"[44]

## III. ANALYSIS

In analyzing a contract on a motion to dismiss under Rule 12(b)(6), the Court must interpret ambiguous provisions in the light most favorable to the nonmoving party.[45] The Court "give[s] priority to the intention of the parties . . . by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language. In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning."[46]

### A. The Motion to Dismiss is Denied in Part

Transdev's Motion to Dismiss Counts I and II are rather easily resolved. Count I seeks specific performance of what Blackstreet contends is a contractual

---

[44] *Id.* at 873 (quoting *Vanderbilt Income & Growth Assoc., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)); *see also In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169–70 (Del. 2006) ("Without the ability to consider the document at issue in its entirety, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure."). Because the SPA is integral to Blackstreet's claim and incorporated into its counterclaim by reference, I refer to its provisions throughout. *See generally* Compl., Ex. A, Dkt. No. 1 [hereinafter the SPA].

[45] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 881 (Del. Ch. 2009).

[46] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009); *see also, e.g., In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

right to submit the working capital dispute to an Independent Accountant.[47] Transdev counters that this claim is merely a redundant mirror image of its own request for declaratory relief.[48]  It is true that, in addition to specific performance, Count I also seeks a mirror-image declaration regarding the meaning of the contractual language at issue.  However, specific performance is an equitable remedy requiring a demonstration not only of a contractual right, but also that equity is compelled to act to enforce the right.[49]  A request for specific performance is therefore not merely redundant of Transdev's claim.

Transdev also avers that the specific performance claim is unripe, because Transdev's declaratory judgment claim remains outstanding, under the theory that there can be no breach leading to specific performance while the legal issues remain unresolved.[50]  A specific performance request may be ripe, however, when a duty to perform is outstanding;[51] such is Blackstreet's allegation here.

---

[47] *See* Am. Countercl. ¶¶ 46–60.  Count I also requests, in the alternative, a declaratory judgment that the SPA requires submitting the Disputed Amounts to an Independent Accountant. *See id.*

[48] *See* Opening Br. of Pl.-Countercl.-Def. in Support of its Mot. to Dismiss Def.-Countercl. Pl.'s Am. Countercls. 13–15, Dkt. No. 35 [hereinafter Transdev's Op. Br.].

[49] *See, e.g.*, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d at 883.

[50] *See* Reply Br. of Pl.-Countercl.-Def. in Support of its Mot. to Dismiss Def.-Countercl. Pl.'s Am. Countercls. 24–26, Dkt. No. 41 [hereinafter Transdev's Reply Br.]. In support of this proposition, Transdev notes that "the Delaware courts will not grant specific performance when the contract has not been breached and therefore the controversy is not ripe." Transdev's Reply Br. 25 (citing *Mehiel v. Solo Cup Co.*, 2005 WL 1252348, at *8 (Del. Ch. May 13, 2005)).

[51] *See, e.g*, *Chavin v. H. H. Rosin & Co.*, 246 A.2d 921, 922 (Del. 1968) ("The object of specific performance is to enforce a plaintiff's equitable rights, and to compel a defendant to specifically perform his equitable obligations."). At this early stage in the proceedings, I must accept

11

The record necessary to invoke equity requires a factual record not appropriate to a pleading-stage motion such as the one before me. Accordingly, Transdev's motion to dismiss Count I is denied.

Count II alleges that Transdev breached the SPA by failing to accept responsibility for Aged Accounts Payable, resulting in what Blackstreet alleges is Transdev's improperly-computed Estimated Closing Working Capital Statement.[52] Transdev points out that contractually, this must be an indemnification claim, not a breach claim. This, argues Transdev, is because the SPA limits recovery for breach to indemnification. Further, Transdev avers that Blackstreet is not entitled to indemnification, because under the facts pled in light of the language in the SPA, indemnification is contractually unavailable; and, alternatively because Blackstreet is not out-of-pocket.[53] Accordingly, per Transdev, Blackstreet has failed to state a claim.

It is true that contractual interpretation involves issues of law often well suited to motions to dismiss.[54] The questions here presented involve mixed issues of fact and law regarding a complex stock-purchase agreement. Count II, I note, is pled in

---

Blackstreet's allegations, and the reasonable inferences therefrom, that Transdev's failure to refer the Disputed Amounts to an Independent Accountant was a breach of contract. Therefore, Blackstreet's claim for specific performance cannot be dismissed as unripe.

[52] Am. Countercl. ¶¶ 61–64.

[53] *See, e.g.*, Transdev's Op. Br. 19; Transdev's Reply Br. 21.

[54] *E.g. Schuss v. Penfield Partners*, L.P., 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008).

the alternative. The issue it is directed toward, the computation of working capital and relief for any improprieties therein, is the whole subject of this ongoing litigation; thus, resolution of the Motion to Dismiss Count II is unlikely to avoid appreciable litigation effort. The question is whether I must resolve this alternative request for relief by construing the contract at this pleading stage, regardless of the fact that other allegations in the Complaint and Amended Counterclaim may render the indemnification claim moot. That determination, it seems to me, should await resolution of the many predicate issues raised, which may moot Blackstreet's damages/indemnification claim in any event.[55] That is the efficient time to determine whether any portion of Count II survives. Accordingly, I deny the Motion to Dismiss Count II without prejudice to its renewal (as a motion for judgment on the pleadings or otherwise) should it become appropriate.

### B. The Motion to Dismiss Count III is Granted

Transdev's Motion to Dismiss Count III, by contrast, must be granted. Count III is a claim, purportedly, for fraud in the inducement.[56] Blackstreet alleges that Transdev represented contractually that "SuperShuttle's Financial Statements were:

---

[55] For instance, if Transdev is correct that Blackstreet has accepted Transdev's Estimated Closing Working Capital Statement (or that its objections were invalid), I likely never reach the indemnification question. Alternatively, if Blackstreet is entitled to specific performance or a declaratory judgment, I similarly never reach the indemnification question.

[56] Am. Countercl. ¶¶ 65–75.

(a) 'prepared in accordance with GAAP . . .' and (b) 'fairly presented . . . the financial condition of SuperShuttle as of the respective dates they were prepared,'" and that these statement were "incorporated into the SPA itself."[57] I note that Blackstreet itself uses the defined *contractual* term "Financial Statements" in delimiting the fraudulent conduct. The fraud allegation is that Transdev promised to provide Blackstreet with GAAP-compliant financial statements, that such promise was made to induce Blackstreet to purchase SuperShuttle, and that Transdev failed to keep that promise. But, if true, this states a contract claim. The duty to provide certain financial statements is not a common-law duty; it arises solely by contract. Blackstreet's allegations are that this contractual duty was breached. It cannot also successfully argue that it was defrauded by Transdev's failure to satisfy an obligation that arose exclusively from the terms of the SPA.

The SPA,[58] and more fundamentally, the common law, limit Blackstreet's ability to allege breach of the contract's terms as the basis of a fraud claim. "[C]ouching an alleged failure to comply with the contract at issue as a failure to disclose an intention to take certain actions arguably inconsistent with that contract

---

[57] Def. Countercl.-Pl.'s Answering Br. in Opp'n to Pl. Countercl.-Def.'s Mot. to Dismiss Am. Countercls. 5, Dkt. No. 39 [hereinafter Blackstreet's Answering Br.].
[58] *See* SPA §§ 3.28, 7.01, 8.09(a).

14

is 'exactly the type of bootstrapping this Court will not entertain.'"[59] If the financial statements were not compliant with the promises made in the SPA, Transdev has committed a contractual breach. But, having agreed to be bound by the contract, Blackstreet cannot litigate a tort action as a result of allegations of breach.[60] That is, Blackstreet identifies no duty breached by Transdev, beyond those duties imposed by contract. In such a situation, Blackstreet is limited to its contractual remedies.

Blackstreet argues that it has suffered fraud in the inducement; that it would never have entered the SPA if it had known that Transdev would produce non-compliant financial statements that would prevent SuperShuttle from receiving a proper true-up of working capital. But this is the quintessence of a bootstrap from contract to fraud. I note, in that regard, that the promises allegedly breached by Transdev were promises to perform *in the future*: Blackstreet defines the fraud alleged as Transdev's promise under the SPA that it "would provide a 'good faith' statement of SuperShuttle's Estimated Closing Working Capital . . . in accordance

---

[59] *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *17 (Del. Ch. Dec. 30, 2010) (quoting *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *8 (Del. Ch. Aug. 3, 2004)); *see also Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2020 WL 4692287, at *16 (Del. Ch. Aug. 13, 2020) ("A bootstrapped fraud claim thus takes the simple fact of nonperformance, adds a dollop of the counterparty's subjective intent not to perform, and claims fraud."); *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010) ("[A] plaintiff cannot bootstrap a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." (internal quotations omitted)).
[60] *See, e.g., Narrowstep, Inc.*, 2010 WL 5422405, at *15.

15

with GAAP," which it failed to do.[61]  Also, Blackstreet avers that fraud resides in the contractual promise Transdev made "to provide" unaudited financials, before closing, in accordance with GAAP.[62]  These obligations, allegedly unperformed, arise solely by contract.

Blackstreet relies on *Abry Partners V, L.P. v. F&W Acquisition LLC*[63] for the proposition that knowingly false contractual representations may breach a duty in tort as well as contract.  In that case, however, financial statements were not merely inaccurate or misrepresented; they were alleged to have been manipulated to induce the contract at issue.[64]  The buyer alleged that the company used a variety of improper methods to manipulate its reported earnings and overstate its revenues in a series of financial reports.[65]  Specifically, the company, a book and magazine publisher, engage in such hijinks as "backstarting," providing new magazine subscribers back issues when they receive their first issue under the subscription; "channel stuffing," artificially inflating revenue by providing discounts to retailers without accounting for the associated increase in returns of unsold inventory; extending quarterly reporting periods of its subsidiaries to mask losses; shipping

---

[61] Blackstreet's Answering Br. 31.
[62] Blackstreet's Answering Br. 32.
[63] 891 A.2d 1032 (Del. Ch. 2006).
[64] *Id.* at 1038–41.
[65]*Id.*

16

subscriptions early to shift revenue from July to June; and reporting revenues in one period while delaying reporting of expenses until the following period.[66]

Here, the allegations are simply that Transdev maintained and provided its records in a way that did not comply with what it had promised in the SPA.[67] If so, and damage has resulted, this is a mundane contract claim, and not a tort claim.

Having determined that the allegations of Count III sound in contract, not fraud, I need not examine Transdev's forceful argument that Count III otherwise fails to plead the elements of a claim for fraud.

## IV. CONCLUSION

For the forgoing reasons, Transdev's Motion to Dismiss Blackstreet's Amended Counterclaims is GRANTED IN PART and DENIED IN PART. The parties should provide an appropriate form of order.

---

[66] *Id.* 1038–39

[67] Blackstreet also notes that Transdev "provided false financial information and commingled assets of its affiliates." Am. Countercl. ¶ 28. Because Blackstreet alleges no facts to support these conclusions, I need not consider them further.